UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT
New Haven Division

| | | |
|---|---|---|
| IN RE:  HERMANN VANECK | : | |
| Debtor, | : | CASE NO:  3:15-CV-00343-SRU |
| Bankruptcy Petition #: 15-30014 | : | **BRIEF OF DEBTOR,** |
| | : | **APPELLANT** |
| | : | MAY 21, 2015 |

The matter before this District Court relates to the confluence of events and

representations made by Linda St. Pierre[1] to the United States Bankruptcy Court ["USBC"] in

the matter of the debtor's bankruptcy petition.  The Court, relying in large measure upon the

representations and Pleadings made and signed by St. Pierre, issued an Order  ["the Order"]

lifting the automatic stay protections of the debtor as respects certain property located in

Ivoryton, CT  ["the Property"].  Debtor is aggrieved and Appeals from the issuance of the Order.

The Court may be apprised that Hunt, Leibert has claimed to represent a vast number of

entities in litigation with the debtor over the Property, in other courts; that list includes, not

exhaustively, the entities "Bankers Trust" (in various iterations); Wells Fargo Bank; Impac

Funding Corporation;  Impac CMB Trust, a Delaware business trust; IMH Assets Corp; GRP/AG

Holdings LLC; GRP Financial Services Corp; GRP/AG Capital LLC; GRP Loan LLC; GRP/AG

Trust; DLJ Mortgage Capital Inc.  In reality, the parade of various entities was a carefully

constructed conceit, crafted to place a veil of opacity as to who had actually hired Hunt, Leibert

and what the various claims were, if any.  The real player turns out to be Select Portfolio

---

[1] Linda St. Pierre is an attorney with the foreclosure-mill law firm of Hunt Leibert  Jacobson,
P.C. of Hartford, Connecticut.  She regularly appears before the New Haven USBC and is known
to Judge Manning presiding.

Servicing, Inc. ["Select"], a firm[2] that was fined $50,000,000 by the State of Washington and Ordered to close up shop for grotesque mortgage frauds and abuses; Select then moved to Utah and reincorporated itself.

The bulk of these proffered entities turn out to be sham entities, with no corporeal existence that can be determined, and crafted on paper in order to befuddle the Courts. The last entity, and the one whom St. Pierre brought before the Bankruptcy Court as "Movant," "DLJ Mortgage Capital," is traced back to the street address of Credit Suisse, described as the "international predator bank" [See: fn 2] yet there is no record of ownership of any taxable asset with the City of New York; it owns no desk, or chair, or filing cabinet; the telephone lines run through Credit Suisse, and the people involved are Credit Suisse employees.

None of the entities claims being represented by Hunt, Leibert have ever demonstrated purchase of any Note or other Obligation of the Debtor, and all appear to be strangers, both to the transaction and to the Debtor.

Credit Suisse has entered Guilty pleas to federal felony charges of fraud, wire fraud, and racketeering. *See: United States of America v Credit Suisse AG*, 1:14-cr-00188-RBS Doc. 14; U.S. D.C. E. D. Virginia (Alexandria Div), May 19, 2014. Judicial Notice is requested.

---

[2] Select Portfolio was previously named Fairbanks Capital Corp; after the fine and Desist Order, Fairbanks simply moved to Utah and re-incorporated itself as "Select." There is no record of the fine ever having been paid to the State of Washington; Fairbanks (now Select) simply packed up and skipped town. Ultimately, Select sold itself to Credit Suisse, which itself has been denounced by the U.S. Bankruptcy Court for the District of Montana as "an international predator bank." See: *In re Yellowstone Mountain Club, Inc v Blixeth*, 08-61570-11, U.S. Bank. Ct. Distr. Montana, Interim Order (Kirscher, J.): "The naked greed in this case combined with Credit Suisse's complete disregard for the Debtors or any other person or entity who was subordinated to Credit Suisse's first lien position, shocks the conscience of this Court." "The only equitable remedy to compensate for Credit Suisse's overreaching and predatory lending practices in this instance is to subordinate Credit Suisse's first lien position…" by equitable subordination, effectively charging Credit Suisse $232,000,000 in secured claims to subordinated claim position, from first to last in line. *See* at Doc. 289, p. 19.

**Issues presented for Appeal**

1.     Did the Court err in its determination that the Moving Paper styled as *"Motion for In-rem relief from the Automatic Stay pursuant to 11 USC §362(d)(4)"* was properly founded in fact and in law?

    We begin this analysis by examining paragraph **7** of the St. Pierre *Motion*. Therein, St. Pierre graced the Court with the preposterous statements that "Debtor Hermann Vaneck filed this tenth bankruptcy petition under Chapter 7..." St. Pierre further argues [para. **10**] that "in rem relief [filed] by or against the debtor ...or other person with an interest in the property , prior to the completion of the Movant's efforts to enforce its rights concerning the property and all appeals related thereto, shall not operate as a stay (or trigger a stay)..."  Additionally, St. Pierre sets forth the unique proposition that she alone can reach into the debtor's mind and read his thoughts, with the claim that "Upon information and belief, the Borrower, in an effort to **delay, hinder or defraud the Movant**, has filed this bankruptcy petition immediately prior to the scheduled summary process hearing"  [see at para. **9**].  [Note: no "information" was ever forthcoming, thus the claim seems to be predicated on "belief".]

    The preposterous St. Pierre claim of Debtor having filed "10 bankruptcies" in order to "hinder and defraud the Movant in foreclosing" seems central to the *Motion* and centrally persuasive to the Manning Court, thus we examine these particulars first.

    St. Pierre commences her recitation of cases that were designed to "hinder and defraud Movant" with a 1989 Filing [Sept. 25, 1989; 89-01156].  Debtor archly remarks that the house on the subject Property was not even built until 1996; in 1989 it was raw land, and Debtor had never heard of it.  The 1989 case involved the debtor's surety of another's business loans, which

went South; the creditor thereupon abandoned the collateral and the borrowers, and went after debtor as the surety with deep pockets. DLJ had nothing to do with it and "DLJ," whatever their murky status, did not even exist at that time. St. Pierre's suggestion that this Petition was done to "hinder and defraud DLJ" is utterly preposterous.

Nonetheless, in an unsurprising pattern, St. Pierre continued to press that representation as truthful, although she knew perfectly well at the time she wrote it that the representation was a falsity. The Manning Court relied upon the representation. St Pierre further recited that the Petition was "terminated;" implying that it was dismissed; instead, a discharge entered and the case wrapped up properly. St. Pierre was perpetrating a sleight of hand upon the Court.

St. Pierre [as counsel for Select Portfolio posturing itself as "DLJ"] next claimed that a 1992 case [92-51075] was promulgated with the purpose to "hinder and defraud DLJ;" again, the home was not even built, Debtor had not bought the non-constructed home, and DLJ apparently did not exist yet, even as a paper sham corporation.

Rather, that Petition (and a flurry of subsequent ones) revolved around efforts of the IRS to wrongfully assert against Debtor's wife and the family furniture as relates to the IRS's claims against one Mr. Donaldson, a businessman of murky reputation and erstwhile employer of Debtor's wife. Donaldson had been placing Debtor's wife's signature upon various checks to the IRS for his debts thereto, which predictably did not clear; Donaldson fled the jurisdiction, and the first the Debtor knew of it was when an official of the IRS showed up at the door attempting entry to inventory the family furniture. As the family is now the victim of another's fraud, a huge tussle with the IRS ensued, with the IRS ultimately being defeated.

Nonetheless, St. Pierre represents to the Court that all this was done with the "intent to hinder and defraud DLJ," although the house was not even constructed, debtor did not own that

4

Property, and "DLJ" the sham corporation had not yet been paper-crafted.  And the Manning Court accepted the representation without reservation as to the character of St. Pierre or the falsity of her Pleadings.

As to the next up on the list, St. Pierre represents that Debtor filed a May 1, 1992 Petition.  Yet, that number appears to be a court re-numbering of the debtor's section of the precedent matter.  In any event, in 1992 the house was not even built, so it is all utterly irrelevant to anything that St. Pierre could possibly have had a counsel interest in.

St. Pierre then recites two cases in 1996, where the debtor, pro-se, attempted to avail himself of the Court's protections regarding a vexatious litigant, one Linda Levin, who asserted that she had a claim against debtor in the amount of $129.  Levin then spent some $126,000 in legal fees litigating relentlessly against the Debtor, wherein debtor accumulated over $88,000 in his own legal fees, eventually exhausting the Debtor.  Levin is the classic example of a disturbed person abusing the court system. Ultimately, Levin disappeared and took nothing for the litigation.  Nonetheless, St. Pierre would represent to the court that these matters involved "DLJ" over a home that had not even been constructed, for a Property that the Debtor had not yet bought.

Linda St. Pierre next recited a docket, no. 00-30500.  Yet, this docket was not filed by the Debtor and he had nothing to do with it. It also pre-dates the debtor's purchase of the subject Property by two years.  Nonetheless, in the thinking of St. Pierre, this stranger docket was done by Debtor (never mind it is not even his Petition) in order to "hinder and defraud DLJ" on some home which was not purchased, had no mortgage against it, and pre-dated "DLJ" by a decade.  Worse, the Manning Court unreservedly accepted the untruthful representation.

For what Linda St. Pierre claims is "petition no. 7," [06-31703], the matter revolved on claims made by the Town of Branford for water and sewer fees and taxes which became a litigation conflict.  One of the unappreciated weaknesses of State Statute is that attorneys seeking representation fees have no incentive to resolve such matters, as continuing protracted litigation drives up costs to be levied by Statute upon the property owner.  When the charges were paid by the debtor, the cases were resolved within the bankruptcy court and the petition was dismissed. Yet again, Linda St. Pierre and her client "DLJ" had nothing to do with the matter and "DLJ" was not a claimant therein. Nonetheless, St, Pierre represents to the Court that the Petition was done with a state of mind of the Debtor to "hinder and defraud DLJ," although "DLJ" had no claim and was not on the scene.

For what Linda St. Pierre claims is "Petition no. 8," docket no. 08-32911, when this Petition was filed a landlord had broken into the Debtor's workshop and seized all its contents, to a value of some $988,000.  That entity then claimed it would conduct "a public auction" without notice to debtor of the Debtor's irreplaceable property on September 6, 2008; the Debtor found out about it on September 5th and instantly filed for protection from creditors within this Bankruptcy Court.  St. Pierre nonetheless represents to the Court that Debtor filed his petition for the purpose of  "hinder and delay of DLJ" in claiming a mortgage lien right.  Yet, at the time of the filing of this Petition, "DLJ" whatever their claims might be had not even acquired, whatever its murky character, any interest whatsoever in any property of the debtor, and assuredly not in the subject Property (the home). This was in 2008 and "DLJ" does not show up until 2010.

Linda St. Pierre's "no. 9 petition" is apparently a Filing by another party, a trustee of a trust, in Florida.  How St. Pierre concludes that the Debtor has some Standing in a Florida case is unclear; the debtor is not the trustee, does not control that entity, and has nothing to do with any

Filing.  Nor does the Florida trustee petition impact "DLJ," as at that point "DLJ" was neither a title owner nor a mortgagee of the trust.  Nonetheless, by the fertile mind of Linda St. Pierre, anything and everything on the planet is attributable to the Debtor and is demonstrably some act of the Debtor to "hinder and defraud DLJ," never mind that "DLJ" is not a claimant.  Notably, "DLJ" never filed any Proof of Claim or other matter within that Petition.

For the St. Pierre-calculated "no. 10 petition," Linda St. Pierre refers to the instant case. Notably, "DLJ" whatever their murky existence has conspicuously not filed a Proof of Claim within this Docket.  All that the Court had to go on was the *Motion,* and the oral representations of Linda St. Pierre.

As respects what St. Pierre categorizes as "no. 10," which counting includes a plurality of matters in which the debtor is not even peripherally involved and were not filed by him, the claim that it "hindered DLJ" in some manner is preposterous, and not supported by the facts.  St. Pierre points to the filing as being concurrent with a certain "Summary Process hearing," yet this Petition had no impact on that Hearing.  The defendant in that matter was Linda Lounsbury. When the matter came to Hearing, the Court was informed that Debtor was under the protection of the bankruptcy court and participated only as an observer.  The Court [Diana, J.] continued its Proceedings between DLJ and Lounsbury, and made a series of Rulings on matters between the parties.  The Court was content to proceed without involvement of the Debtor herein. Ultimately, counsel for DLJ, Kenneth Pollock[3] [Juris No. 418300] asked for a termination of those Proceedings.

In sum, astonishingly ***none*** of the Petition(s) recited by Linda St. Pierre were filed that would impact any claim of money loss or classic aggrievement of her client "DLJ."  In none of the petitions has "DLJ" ever filed a Proof of Claim.  Nor does debtor owe any debt to "DLJ,"

---

[3] Pollok is an associate with Hunt, Leibert, and apparently was present in Court at the stay-relief Hearing.

whatever the pretentions of St. Pierre in oral argument (notably not coupled with a filing of a Proof of claim).

In **_none_** of the Petitions has "DLJ" stepped forth with a claim. In every Petition, "DLJ" was and is absent. "DLJ," whatever its sham corporation status, has never presented a claim for administration. Nonetheless, St. Pierre has stridently represented to the Court that the Debtor has a conscious state of mind to "hinder and defraud DLJ" from a claim that DLJ itself chooses not to even discuss, much less advance by filing a claim.

The Movant's recitation of 11 U.S.C. § 362(d)(4) as the legal foundation for its Motion is thus not only without foundation; it is flat-out wrongful, and done by St. Pierre in a knowing state of mind in a concerted effort to deceive the Court. The claim that St. Pierre can discern the debtor's mind that his petition was filed to "hinder and defraud DLJ" is pure rubbish, an egregious example of St. Pierre being untruthful to the Court. 362(d)(4) requires for foundation a Finding that the "creditor" has a "claim secured by an interest in such real property," and a further Finding that Debtor engaged in a "scheme to defraud" that creditor by "multiple bankruptcy filings affecting such real property." Neither of those two test prongs is present in the current matter.

First, there is no evidence before the Court that "DLJ," whoever they might be and whatever their murky claim to existence,[4] ever had a secured interest to protect. Up until 2010,

---

[4] "DLJ" is a creature crafted by five managers of the investment firm Donaldson, Lufkin and Jenrette. When Credit Suisse determined to enter the alt-a mortgage market, it purchased Donaldson, Lufkin for the securitization expertise and Fairbanks Capital for servicing, Fairbanks now being adroitly moved from Washington to Utah and re-named "Select Portfolio Servicing" to avoid prosecution by the Washington State's Attorney (and presumably arrest by the State Police). The five managers insisted as quid-pro-quo for moving over to Credit Suisse that they be allowed to craft a paper sham corporation, now called "DLJ," to go litigate paid Notes that were paid off by credit insurances and third-party guarantees, but where the Note itself never was credited and stamped "Paid." The five managers all live in a suburb of New York on Long

that claim of interest was being advanced by yet another paper sham corporation, "GRP Loan LLC.," a Delaware paper front for Kristin Tess, yet another in a long line of loan hustlers with dubious credentials. [5] Tess vanished in Spring 2010 when her operations started attracting both litigation from aggrieved "investors" and attention from the police. Although Hunt. Leibert represented to the bankruptcy court that "GRP" had "assigned the Note" to "DLJ," and thus "GRP" had no further interest to advance within the Court, nonetheless Hunt, Leibert continued to present itself before the Bankruptcy Court in 2010 as counsel for "GRP" and make arguments adverse to the interests of the Debtor therein.  The Court was unruffled by the conduct of Linda St. Pierre in so doing.

Second, there is no evidence of "multiple bankruptcy filings affecting such property," the second prong of the test.  As was recounted above, ***none*** of the Filings referenced "DLJ," and only one Filing contained the subject Property, as whatever was happening previously, the Debtor had not yet even purchased the property, and in some cases the house had not even been built!  Nonetheless, and in the face of these facts, St. Pierre stridently advanced the representation that the Debtor had a "state of mind of intent to hinder and defraud DLJ."  The utter preposterous, incredulous nature of this assertion was made in the specific effort to harm

---

Island, Garden City, and all ride the Long Island RR in to Manhattan together each morning. Credit Suisse provides the office space for the paper sham corporation, created in Delaware for $300.
[5] Kristin Tess set up a plethora of Delaware paper sham entities with short life-spans, and fled the jurisdiction when the cops came calling.  "GRP Loan LLC," which operated out of an anonymous locked-door room with no name anywhere in the building register on the 5th floor at 445 Hamilton Avenue, White Plains NY,   finally had its Authority revoked by the State of New York in Spring 2010.  Whatever left-over paper it was sitting on ended up with the "managers" at "DLJ," although there is no evidence that "DLJ" ever paid anything for a Note of the Debtor, which in any event was long since discharged by credit insurance, albeit not credited to the account of debtor, in violation of CFPB Rules and Regulation Z.

the Debtor, and convince the Court to enter an Order that was unsupported by both the facts of the case and the Statute.

**2.     Did the Court err in its determination that "DLJ" had a claim secured by an interest in real property of the Debtor?**

    **(a)     A successor holder can only hold an interest that a previous holder maintained.**

        The original note was made payable to the entity "Express Capital Lending, Inc." Whatever the dubious status of "Express," any transfer of the rights of "Express" require some evidentiary foundation of subsequent claims of right to flow from the rights of "Express." That foundation is not present in the matter of the subject Property.

        The entity "Bankers Trust Company of California, N.A.," claiming to be a "trustee of a trust," brought suit against the Debtor in the Connecticut State Courts, seeking money damages and foreclosure  [the" BT foreclosure action"] of the Property.  "BT" was represented by (no surprise) Hunt, Leibert, who in turn placed before the State Court a *Motion for Summary Judgment* [the "MSJ Motion"].  Therein, Hunt Leibert produced what it claimed was "the Note." That Note was not Indorsed from Express Capital Lending,  which provoked a *Motion to Dismiss* based on lack of Standing.  To parry the dismissal, Hunt Leibert claimed the existence of an "Indenture" that would establish that *Bankers* was a proper holder;  Hunt Leibert further represented that the Indenture was destroyed "when the airplanes crashed into the World Trade center on 9/11." How a represented $400 million Indenture signed in California the week before ended up in New York and had no duplicate or electronic copy was not explained.

        The Court [Jones, J.] granted Hunt Leibert a delay of 60 days to locate the Indenture. Responsively, Hunt Leibert produced a multi-hundreds-page "Indenture" claimed between

*IMPAC CMB TRUST SERIES 2001-2* and *Bankers Trust Company of California, N.A.* [See at **Exhibit A**]. The representation was made by Hunt, Leibert that this "trust" was dated August 30, 2001, and a signature page for the "Bankers" representative [James Noriega] attested to being executed before Nicholas Charles Gisler, notary public registration number 1406868, on August 30, 2001, by "personal appearance" of Mr. Noriega before Nicholas Gisler. Notary Gisler then affixed his Notarial Stamp upon the paper.

The problem with all this is that Notary Gisler's stamp contains a Notarial expiration date in very small numbers, of March 25, 2007.

Inquiry by the Debtor to the California Secretary of State, Notaries Section, revealed that under California Statute notary commissions are for only four years. *California Code Sec. 8204.* The notarial commission, and the Stamp, did not come into existence until March 26, **2003**. Nonetheless, Hunt, Leibert produced to the Court a document claiming it was affixed to, and attesting to "personal Appearance," on August 30, **2001** – some ***two years previous***. Further inquiry revealed that this was Notary Gisler's first commission. [See: certification from Secretary of State at **Exhibit B**]. He was not a Notary in 2001.

The conclusion is inexorable: Hunt, Leibert orchestrated the construction of a totally fraudulent "Indenture" to cover its tracks at the Summary Judgment Hearing.[6] Further, Hunt, Leibert knew that the proffered indenture" was a fabrication, having instructed its client [Bankers] to manufacture it to satisfy the Court. The perfidy of Hunt, Leibert in so brazenly manufacturing falsified documents and uttering them before the Court seems to have been overlooked by the Bankruptcy Court.

---

[6] The MSJ Hearing came before the State Court in July 2003, wherein Hunt, Leibert again argued that pursuant to the signed Indenture, *Bankers* was the proper party before the court and had Standing to sue. The *Motion* was Denied on other grounds, See: *Memorandum of Decision*, 28 October 2003,[ Jones, J].

**(b)** **The entire *Bankers* trial was conducted by an entity that had already sold whatever interests it might have held, prior to trial. Accordingly, the entire trial was a fraud on the Court, and void ab initio, from which no successor rights can flow.**

Trial in the *Bankers* matter commenced on March 22, 2005. *Bankers* was represented by Hunt, Leibert. It was later discovered that *Bankers* had transferred whatever interests it might have had to the entity *GRP/AG Real Estate Asset Trust 2005-1.* [hereinafter: "GRP/AG"]. The GRP/AG trust document indicates that it is a thirty-year Trust with maturity date of January 25, 2035. *See:* **Exhibit C**. By simple arithmetic, the "trust" commenced on January 24, 2005 – *some two months prior to the trial wherein "Bankers" claimed it was the owner and holder of the loan!*

At the time that Hunt, Leibert took the matter to trial, and made their representations to the trial Court, Hunt, Leibert knew that their client, *Bankers*, no longer had any interest in the Note, having sold their interest to "GRP/AG." Nonetheless, Hunt, Leibert proceeded with their representations to the Court, which were untruthful.

**(c)** **In 2006, Wells Fargo Bank, N.A. claimed to the Court that it, not "GRP," was the entity that was the creditor, and Wells Fargo filed a Proof of Claim to that effect; nonetheless, "GRP" continued to represent that "GRP" had Standing to pursue the debtor.**

By a "Proof of Claim" filed 23 October 2006 by Hunt, Leibert, the entity Wells Fargo Bank declared to the Court that it, and not any of the other Hunt Leibert entities, was the proper party to advanced a claim against the debtor. The "Proof" was signed by an attorney employed by Hunt, Leibert. Interestingly, the Proof states that the "debt was incurred 08/01/2001," which was the origination date of the loan to Express Capital Lending. Incorporated into the "Proof" was an accounting suggesting that all interest, legal fees, escrow advances, late charges, and insurance premiums since 2001 were a claim of Wells Fargo. The accounting, and the

representations made, conflict with the suggestions previously that either *Bankers* or "GRP/AG" were the parties with Standing and claim. *See*: at **Exhibit "D".**

No explanation was ever offered as to why Wells Fargo Bank would or could (given the scrutiny of Regulators) purchase a loan that was claimed to be in default. No explanation was ever offered why Wells Fargo Bank would purchase a loan and include in the purchase price the attorney's fees, various costs, and carry charges that *Bankers* and *Impac Funding* were also claiming. In the alternative, no explanation was ever offered as to why "*Bankers*," the "IMPAC CMB Trust," or "GRP/AG" would concurrently have Standing together with Wells Fargo Bank; their interests would be adverse to each other. Yet, all the documents were signed and proffered to the Court by the law firm of Hunt, Leibert.

The Bankruptcy Court, Manning, J., remained entirely unremarked upon the assertions of Linda St. Pierre of Hunt, Leibert, in the face of the preposterous representations made by Hunt Leibert as respects these other entities before the Court.

 **(d)**   **Where Wells Fargo Bank was the owner of the loan, "GRP Loan" could not sell an interest to "DLJ," and "DLJ" could not purchase an interest from "GRP" which "GRP" did not possess to sell; wherefore, "DLJ" cannot present a claim to this or any Court.**

Consequent to the *Proof* recited above, Wells Fargo filed a second *Proof*, asserting a further balance of $327,760.19 as of February 9, 2007. The law firm filing the Proof was Hunt, Leibert. On 4 January 2007, Wells Fargo by Linda St. Pierre filed her *Motion for Relief from Stay*, Doc. 34 [**Exhibit E**]. Therein, St. Pierre argued that "Movant [Wells Fargo Bank] is the <u>owner and holder of a Note secured by a Mortgage</u> on property owned by the Debtor [the subject Property] by virtue of an Assignment of Mortgage dated **March 14, 2003**, to be recorded on the Ivoryton Land Records."

The astonishing claim made by Linda St. Pierre of Hunt, Leibert stands in stark contrast to the representations made at the *Bankers* trial of **March 22-23, 2005**, where it was asserted that *Bankers Trust* was the entity holding the Note and Mortgage.

As of March 2003, St. Pierre (and her colleagues at Hunt, Leibert) have represented to different Courts including this Bankruptcy Court that at least ***three entities*** laid claim to the subject Property, by and through the Note and Mortgage:  (1)  Bankers Trust; (2) Wells Fargo; (3) GRP Loan LLC.   The "Wells Fargo" claim as represented by both two (2) Proof of Claim and the statements made by St. Pierre to this Court that it was the "owner and holder" of the debt since March 14, 2003 are especially troubling, as they would confirm the proposition that Hunt, Leibert made claims by Affidavit to the State Court that were known to be untruthful  (the claim that *Bankers Trust* was the proper party pursuant to an Indenture Agreement dated in 2001, and used as a foundation for *Motion for Summary Judgment* dated March 21, 2003 [Dkt 140.00] -- a date ***only seven (7) days after the date that Wells Fargo claims ownership***, as set forth in the St. Pierre Pleading to this Court dated January 4, 2007 [Dkt 34, S*upra*].

With Wells Fargo further filing two (2) Proof of Claim in 2006 and 2007 before this Court, and coupling that with the representation of St. Pierre that Wells Fargo was the owner and holder of the note and mortgage back on March 14, 2003, it becomes glaringly apparent that ***the entire trial of 2005, wherein it was represented that "Bankers Trust" was the creditor, was a complete charade***, and a grotesque fraud upon the Court.  Further, the fraud, breathtaking in its brazenness, was orchestrated, start to finish, by the Hunt, Leibert law firm.

As "GRP Loan" seems to take its position as a successor to *Bankers*, and *Bankers* was never a true creditor inasmuch as Wells Fargo was the actual creditor (albeit disguised and

hidden in the shadows by Hunt, Leibert), then "GRP" cannot transfer to "DLJ" that which it does not possess. Wherefore, any claim by "DLJ" is meritless.

> (e)   **Where "GRP Loan" transferred its interest, once having done so it no longer had any aggrievement, thus lost Standing;  without Standing, "GRP Loan" could not further engage the judicial machinery of this or any Court.  "GRP Loan" had no Standing to Petition the Court to install "DLJ" in its stead.**

By WARN Notice to the New York Dept. of Labor dated October 2, 2009, "GRP" warned that the companies at 445 Hamilton Avenue were "closing" with an effective date of "12/31/2009."  "GRP Loan" was shut down before 2010, notwithstanding that Linda St. Pierre and her colleagues at Hunt, Leibert cheerfully continued to file Pleadings and make representations to multiple tribunals that "GRP" was a continuing entity with Standing to be before the courts.  On October 22, 2009, "GRP" finalized an "asset purchase and sale agreement" with  Credit Suisse, filed and Recorded by the Securities and Exchange Commission on Form 8-K.  It becomes apparent that, whatever the pretensions of "GRP," whatever rights it might have had were extinguished no later than October 22, 2009.

Keeping in mind that all of the above conflicts with the assertions and representations made in another Docket that Wells Fargo Bank, N.A. was (as Movant) the owner and holder of the Note and Mortgage since March 14, 2003,  *See*: Doc. <u>34</u>, US Bankr. Ct D. Ct. 06-31703 (01/04/2007), **Exhibit E**. Linda St. Pierre even crafted a Proposed Order for the Court's consideration, in which she included language to allow Wells Fargo Bank stay-relief to "contact the debtor by telephone or writing [and] enter into any agreement, loan modification, refinance agreement, or other loan workout agreement."   This would suggest that Linda St. Pierre was well rehearsed and briefed on the nature of the claims of Wells Fargo and that *only* Wells Fargo had a money interest in the subject Property  - *and not "GRP Loan" or "DLJ."*

Notwithstanding, both by a Pleading dated November 30, 2009 [Doc. 220, 08-32911] and by *Motion to Substitute Party Plaintiff* dated March 18, 2010, GRP Loan LLC interposed itself into the Court systems as "Movants" over the signatures of Hunt, Leibert associate or partner attorneys, engaging the Court's machinery by a client that either had no further interest in the matter (and thus had no Standing), or was corporately dissolved – the doors shut, and nobody home when the cops came calling. The *Motion to Substitute*, brought by "GRP Loan" when "GRP" no longer even existed (and six months after "GRP" had abandoned whatever interest it might have had) came before the State Court on April 15, 2010, and Granted.  Thus, the foundation document for "DLJ" was obtained fraudulently within the State Court Action by a Pleading written by Hunt, Leibert, which untruthfully represented that "GRP Loan" had Standing to Motion the State Court.

Being mindful that throughout all this Hunt-Leibert also asserted that it was Wells Fargo Bank, and not "GRP," that had an interest in the Mortgage and had Standing,  Hunt-Leibert then proceeded to file to Open and issue Judgment in the State Court Action in the name of the new paper sham entity, "DLJ."  The Court ultimately issued a *Notice* to that effect on August 8, 2010. Unfortunately for the scheme of Linda St. Pierre and her associates at Hunt-Leibert, it turns out that the owner of an interest in the Property  [the Adams Irrevocable Trust] was before the bankruptcy courts in Florida on unrelated matters.  This was admitted to by Linda St. Pierre in her *Motion for In-rem Stay Relief,* see at para. 7.  With that entity before that Court, and with no relief from automatic stay issued by that Court as against the Trustee or the Estate,  it turns out that the State Court Action (requesting Judgment and any issuance thereof) was utterly void for want of Jurisdiction of the State Court over the Property subject matter at the time it came before the State Court for adjudication.

It has to be kept in mind that, throughout, Linda St. Pierre knew perfectly well of the

sequence of events as outlined above, yet nonetheless chose to pursue a series of Court Motions

and actions to which either the client was not a party in interest, or the client had no Standing, or

there was no Jurisdiction of the Court to even Hear the matter. Nonetheless, none of the facts

deter Linda st. Pierre from her improper conduct.

3.     **Did the Court err in holding a Hearing after a massive snowstorm, when the Debtor
       was snowbound and could not attend Court in New Haven, some 30 miles distant?**

It is undisputed that the Court's Hearing date on the St.Pierre *Motion* [Dkt 12] was

scheduled for 04 February 2015.  The Hearing was set over from the Court's original date due to

one of a series of massive snowstorms.  On Feb. 02-03, yet another massive snowstorm came to

Connecticut, and dumped some four (4) feet onto the Debtor's property. During the course

thereof, the town plow had attempted to keep the debtor's Lane open (albeit without success),

and had further packed heavy snow into the driveway entrance, now some five feet thick, and as

solid as concrete.  *See*: at **Exhibit F**. [plus photo of roadway taken on Thursday.]

Although debtor called the Court to advise that the situation was impossible, nonetheless

the court [Manning, J.] made the determination to Conduct the Hearing.  Debtor notes that he

lives in a rural area, where there is no public transportation, and as debtor is elderly and pushing

age 70,  it is unreasonable for the Court to insist that Debtor shovel out some 133 feet of

driveway, plus the packed-in mound barrier five feet high and twelve feet thick at the curbside,

and struggle down unplowed roads the thirty miles to the Court House, by 10:00 a.m..

Debtor represents that the Court engaged in an unreasonable and arbitrary abuse of

discretion in insisting that its Hearing proceed under the storm circumstances as described above.

4.   **Did the Court err in Conducting its Hearing on 04 February 2015 when Movant,
     whatever its lack of credentials, did not comply with the specific Notice instructions
     contained within that Order?**

The Court's ORDER, dated 13 January 2015, ECF Doc. 14, explicitly required that

"Movant" [the entity "DLJ" that Linda St. Pierre claimed to represent as the holder of the note,

notwithstanding her claims otherwise that Wells Fargo Bank was the holder] make Service of the

Order upon the Debtor no later than January 14, 2015, by "overnight delivery service."

To no surprise, St. Pierre cavalierly ignored this requirement. The ORDER stated:

> "**ORDERED** THAT, ON OR BEFORE **JANUARY 14, 2015**, Movant shall serve
> this order, the Substantive Motion and the proposed order thereon upon [all appropriate
> notice parties] and the United States trustee by this Court's CM/ECF system (if
> applicable, otherwise by overnight mail or overnight delivery service)."

ORDER [bold print in original]

Notwithstanding that St. Pierre ignored the ORDER, nonetheless the Court proceeded

with the Hearing.  When the Debtor found out about the failure to follow the Court's explicit

Order and complained, St. Pierre airily declared that "it made no difference" and the failure

should be ignored by the Court. Nonetheless, St. Pierre then did send the Order by UPS Next

Day Letter envelope, in a mailing that departed Hunt-Leibert on 01/26/2015, and arrived with the

Debtor at 1:06p.m. on Wednesday, **01/28/2015**. The arrival was conspicuously *__after__* the date and

time of the originally scheduled Hearing, which was set for 10:00 a.m. *See*: **Exhibit "G"**.

The requirement of the ORDER was that Movant *shall* serve on or before January 14,

2015.  "Shall" is the Court's choice of wording in the Court's Order, not the Debtor's.

St. Pierre further filed an egregiously untruthful *Certification of Service* with the Court,

representing that she had served the debtor, when this was untruthful.  The continuing pattern

and practice of St. Pierre in flat-out lying to the Bankruptcy Court seems to be cheerily overlooked by the Court.

Debtor represents that for the Court to hold the Hearing in the face of Movant's [St. Pierre's] grotesquely willful and deliberate "service" done two weeks later, is an abuse of discretion. On that basis alone, the Court should have refused to conduct any Hearing and Denied "DLJ's" Motion with prejudice.

WHEREFORE, the Debtor is aggrieved by the Order of the Court and for relief requests of this Court in Review to Vacate the Bankruptcy (trial) Court's Order, Document ECF 12, _with prejudice_, and further ORDER that the entity "DLJ Mortgage Capital Inc." is barred from filing further motion papers or Pleadings before the Court, and FURTHER to affirm the continuance of the Debtor's Automatic Stay.

BY THE DEBTOR,

HERMANN VANECK
24 Ebony Lane
Ivoryton CT 06442
(860) 514-5902

Certificate of Service
Service is hereby certified by deposit into the
United States mails, first-class postage prepaid,
Or by hand delivery,
Or by electronic service via the ECF system,  addressed to:

Kara S. Rescia, Esq.
Chapter 7 Trustee
200 North Main Street, East 14
East Longmeadow, MA 01028

U.S. Trustee
Giaimo Federal Building
150 Court Street, Room 302
New Haven, CT 06510

Linda St. Pierre, Esq.
Hunt, Leibert Jacobson, P.C.
50 Weston Street
Hartford, CT 06120

On 2, February 2015:

Debtor

## CERTIFICATION OF TYPE AND FONT

Petitioner undersigned hereby certifies that this Brief is typed in Times new Roman in
12-point type size.

HERMANN VANECK
Debtor

# EXHIBIT

# "A"

Exhibit BE

IMPAC CMB TRUST SERIES 2001-2

Issuer

and

BANKERS TRUST COMPANY OF CALIFORNIA, N.A.

Indenture Trustee

INDENTURE

Dated as of August 30, 2001

COLLATERALIZED ASSET-BACKED BONDS

[1] PW NYLEGAL:128065 2] 17532-00127  03/10/01/03, 19pm

This Indenture, dated as of August 30, 2001, between Impac CMB Trust Series 2001-2, a Delaware business trust, as Issuer (the "Issuer"), and Bankers Trust Company of California, N.A., a national banking association, as Indenture Trustee (the "Indenture Trustee"),

## WITNESSETH THAT:

Each party hereto agrees as follows for the benefit of the other party and for the equal and ratable benefit of the Holders of the Issuer's Collateralized Asset-Backed Bonds, Series 2001-2 (the "Bonds").

## GRANTING CLAUSE

The Issuer hereby Grants to the Indenture Trustee at the Closing Date, as trustee for the benefit of the Holders of the Bonds, all of the Issuer's right, title and interest in and to whether now existing or hereafter created by (a) the Mortgage Loans, Eligible Substitute Mortgage Loans and the proceeds thereof and all rights under the Related Documents; (b) all funds on deposit from time to time in the Collection Account allocable to the Mortgage Loans excluding any investment income from such funds; (c) all funds on deposit from time to time in the Payment Account and in all proceeds thereof; (d) all rights under the (i) Mortgage Loan Sale and Contribution Agreement as assigned to the Issuer, (ii) the Servicing Agreement and any Subservicing Agreements, (iii) any title, hazard and primary insurance policies with respect to the Mortgaged Properties, (iv) the rights with respect to the Derivative Contracts and the Special Certificate Cap Contract as assigned to the Issuer; and (e) all present and future claims, demands, causes and choses in action in respect of any or all of the foregoing and all payments on or under, and all proceeds of every kind and nature whatsoever in respect of, any or all of the foregoing and all payments on or under, and all proceeds of every kind and nature whatsoever in the conversion thereof, voluntary or involuntary, into cash or other liquid property, all cash proceeds, accounts, accounts receivable, notes, drafts, acceptances, checks, deposit accounts, rights to payment of any and every kind, and other forms of obligations and receivables, instruments and other property which at any time constitute all or part of or are included in the proceeds of any of the foregoing (collectively, the "Trust Estate" or the "Collateral").

The foregoing Grant is made in trust to secure the payment of principal of and interest on, and any other amounts owing in respect of, the Bonds, equally and ratably without prejudice, priority or distinction, and to secure compliance with the provisions of this Indenture, all as provided in this Indenture.

The Indenture Trustee, as trustee on behalf of the Holders of the Bonds, acknowledges such Grant, accepts the trust under this Indenture in accordance with the provisions hereof and agrees to perform its duties as Indenture Trustee as required herein.

[TPW: NYLEGAL:128065.1] 17572-00123  03/10/03 03:49pm

IN WITNESS WHEREOF, the Issuer and the Indenture Trustee have caused their names to be signed hereto by their respective officers thereunto duly authorized, all as of the day and year first above written.

IMPAC CMB TRUST SERIES 2001-2,
as Issuer
Wilmington Trust Company,
not in its individual capacity
but solely as Owner Trustee

By: _____
   Name:
   Title:

BANKERS TRUST COMPANY OF CALIFORNIA, N.A.,
as Indenture Trustee

By: _____
   Name:   James F. Noriega
   Title:   Associate

[TPW NYLEGAL:118065.1]17572-00127 03/10/03 03:49pm

05/30/2003 15:03 FAX                          DEUTSCHE BANK                                   ☒003

STATE OF        California    )
                             ) SS.:
COUNTY OF       Orange        )

On this 30th day of August 2001, before me personally appeared ___James Noriega___
to me known, who being by me duly sworn, did depose and say, that he/she is the of the Indenture
Trustee, one of the corporations described in and which executed the above instrument; and that she
signed her name thereto by like order.

Notary Public

NOTARY PUBLIC

[NOTARIAL SEAL]

NICHOLAS CHARLES GISLER
Commission # 1406868
Notary Public.- California
Orange County
My Comm. Expires Mar 25, 2007

[TPW- NYLEGAL:128G65.1] 17373-00127  03/10/03 03.49pm

VANECK          1100337760          2601006595          2333326          20 SA2630E          220,000.00

# EXHIBIT

# "B"



EXHIBIT "B"

# SECRETARY OF STATE

I, KEVIN SHELLY, Secretary of State of the State of California hereby certify:

That Nicholas Charles Gisler was appointed a NOTARY PUBLIC in and for the State of California for a term of four years commencing March 26, 2003 and ending March 25, 2007, commission number 1406868.

I FURTHER CERTIFY that the aforesaid person complied with the provisions of the Section 8213 of the Government Code by filing an oath of office and official bond with the appropriate County Clerk, thereby qualifying as a Notary Public as evidenced by the certificate of said County Clerk, which is on file in my office pursuant to law.

I FURTHER CERTIFY that the aforesaid person, is (or was) during the term of the commission a duly qualified and acting Notary Public, empowered to act as such Notary Public in any part of this State and authorized to take the acknowledgment or proof of powers of attorney, mortgages, deeds, grants, transfers, and other instruments of writing executed by any person, and to give a certificate of such proof or acknowledgment endorsed on or attached to the instrument, and to take depositions and affirmations, in all matters incident to the duties of the office, or to be used before any court, judge, officer or board.

IN WITNESS WHEREOF, I hereunto set my hand and affix the Great Seal of the State of California this 11th day of August 2003.



KEVIN SHELLEY
Secretary of State

NP-24 A (REV. 1-03)

# EXHIBIT

# "C"

CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM

## $126,409,000 (Approximate)

# GRP/AG Real Estate Asset Trust 2005-1

## Notes

## GRP/AG Capital, LLC, Depositor

## GRP Financial Services Corp., Servicer

| Class | Class Principal Amount* | Interest Rate** | Maturity Date |
|-------|-------------------------|-----------------|---------------|
| A | $126,409,000 | 4.85% | January 25, 2035 |

\*    The actual initial Class Principal Amount may vary by as much as five percent, depending upon the extent to which the Mortgage Assets are changed as described under "Description of the Mortgage Assets — Changes in the Mortgage Assets."

\*\*    For each Accrual Period (as defined herein) after the Accrual Period relating to the first Payment Date on which the aggregate Principal Balance (as defined herein) of the Mortgage Assets is less than 10% of the Cut-off Date Principal Balance, the Interest Rate on the Class A Notes will increase by an additional 0.50%, subject to a maximum Interest Rate of 15.00%

GRP/AG Real Estate Asset Trust 2005-1 (the "Issuer" or the "Trust") will be created pursuant to a Trust Agreement dated as of May 1, 2005 (the "Trust Agreement"), between GRP/AG Capital, LLC, as depositor (the "Depositor"), and Wilmington Trust Company, as owner trustee (the "Owner Trustee"). The Trust will issue one class (a "Class") of notes (the "Notes"), and one Class of certificates (which are not offered hereby) representing ownership of the residual interest in the Trust (the "Residual Interest Certificates" and, together with the Notes, the "Securities"). The Notes will be issued pursuant to an Indenture dated as of May 1, 2005 (the "Indenture"), between the Trust and Wells Fargo Bank, N.A., in its capacity as indenture trustee (in such capacity, the "Indenture Trustee"). The property of the Trust will consist primarily of (i) a pool (the "Mortgage Pool") of conventional, adjustable and fixed rate, first and second lien, fully amortizing and balloon, one- to four-family residential mortgage loans (the "Mortgage Loans"), the substantial majority of which are in foreclosure or are otherwise non-performing; (ii) 100% of the equity interest in GRP/AG REO 2005-1, LLC ("REO LLC"), a newly-created special purpose entity, the assets of which are properties to which title will have been acquired through foreclosure of a mortgage or acceptance of a deed in lieu of foreclosure ("REO Properties" and, together with the Mortgage Loans, the "Mortgage Assets"); and (iii) other collateral pledged under the Indenture (together with the Mortgage Assets, the "Collateral").

**For a discussion of significant risks to be considered by prospective investors in the Notes, see "Risk Factors" and "Yield, Loss and Principal Payment Considerations."**

*(cover continued on next page)*

**THIS PRIVATE PLACEMENT MEMORANDUM IS NOT TO BE COPIED OR OTHERWISE REPRODUCED IN ANY MANNER WHATSOEVER. FAILURE TO COMPLY WITH THIS DIRECTIVE CAN RESULT IN A VIOLATION OF THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT").**

The Notes offered hereby will be purchased by Deutsche Bank Securities Inc. ("DBSI") and are being offered by DBSI from time to time in negotiated transactions or otherwise at varying prices to be determined at the time of sale. The Notes are offered subject to prior sale, withdrawal, cancellation or modification of the offer by the Depositor with or without notice, to delivery and to certain further conditions. See "Private Placement." It is expected that delivery of the Notes will be made initially in book-entry form through the Same Day Funds Settlement System of The Depository Trust Company on or about June 9, 2005 (the "Closing Date").

# Deutsche Bank Securities

June 1, 2005

# EXHIBIT

# "D"

**FORM B10 (Official Form 10) (04/04)**

| UNITED STATES BANKRUPTCY COURT _____ | DISTRICT OF CONNECTICUT_____ | PROOF OF CLAIM |
|---|---|---|

| Name of Debtor    JAN HERMAN VEN ECK | Case Number  06-31703  03-31703-asd | |

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A "request" for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.

| Name of Creditor (The person or other entity to whom the debtor owes money or property):<br><br>WELLS FARGO BANK, N.A.<br><br>Name and address where notices should be sent:<br>Wells Fargo Bank, N.A.<br>c/o GRP Financial Services, Corp.<br>360 Hamilton Avenue, 5th Floor<br>White Plains, NY 10601<br><br>Telephone number:  (860) 808-0606 | ☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.<br><br>☐ Check box if you have never received any notices from the bankruptcy court in this case.<br>☐ Check box if the address differs from the address on the envelope sent to you by the court. | THIS SPACE IS FOR COURT USE ONLY |

| Account or other number by which creditor identifies debtor:<br>568390 | Check here ☐ replaces<br>if this claim ☐ amends    a previously filed claim, dated:_____ | |

**1. Basis for Claim**

- ☐ Goods sold
- ☐ Services performed
- ☑ Money loaned
- ☐ Personal injury/wrongful death
- ☐ Taxes
- ☐ Other _____

☐ Retiree benefits as defined in 11 U.S.C. § 1114(a)
☐ Wages, salaries, and compensation (fill out below)
Last four digits of SS #: _____
Unpaid compensation for services performed
from _____ to _____
    (date)        (date)

| **2. Date debt was incurred:**  08/01/2001 | **3. If court judgment, date obtained:** |
|---|---|

**4. Total Amount of Claim at Time Case Filed: $** _____ (unsecured) | 325073.71 (secured) | (priority) | 325,073.71 (Total)

If all or part of your claim is secured or entitled to priority, also complete Item 5 or 7 below.
☑ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all interest or additional charges.

**5. Secured Claim.**
☑ Check this box if your claim is secured by collateral (including a right of setoff).

Brief Description of Collateral:
☑ Real Estate   ☐ Motor Vehicle
☐ Other_____

Value of Collateral:   $_____

Amount of arrearage and other charges at time case filed included in secured claim, if any: $ **122,807.75 + post petition attorney fees $300.00= $123,107.55**

**6. Unsecured Nonpriority Claim $** _____

☐ Check this box if: a) there is no collateral or lien securing your claim, or b) your claim exceeds the value of the property securing it, or if c) none or only part of your claim is entitled to priority.

**7. Unsecured Priority Claim.**
☐ Check this box if you have an unsecured priority claim

Amount entitled to priority $_____
Specify the priority of the claim:
☐ Wages, salaries, or commissions (up to $4,925),* earned within 90 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(3).
☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(4)
☐ Up to $2,225* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(6).
☐ Alimony, maintenance, or support owed to a spouse, former spouse, or child - 11 U.S.C. § 507(a)(7).
☐ Taxes or penalties owed to governmental units-11 U.S.C. § 507(a)(8).
☐ Other - Specify applicable paragraph of 11 U.S.C. § 507(a)(___).
*Amounts are subject to adjustment on 4/1/07 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.

**8. Credits:** The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim. | THIS SPACE IS FOR COURT USE ONLY

**9. Supporting Documents:**    Attach copies of supporting documents, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements, and evidence of perfection of lien. DO NOT SEND ORIGINAL DOCUMENTS. If the documents are not available, explain. If the documents are voluminous, attach a summary

**10. Date-Stamped Copy:**    To receive an acknowledgement of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim

| Date<br>10/23/2006 | Sign and print the name and title. If any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any)<br>BENJAMIN T. STASKIEWICZ, ESQ.<br>ATTORNEY FOR CREDITOR | |

Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both 18 U.S.C. §§ 152 and 3571

UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT

IN RE:
JAN HERMAN VAN ECK                    :       CHAPTER 13
          DEBTOR                      :       CASE NO. 06-31703 ASD
                                      :       OCTOBER 23, 2006


SCHEDULE A

ITEMIZATION OF CLAIM OF WELLS FARGO BANK, N.A.


**A. Total Debt As Of October 5, 2006**

| | |
|---|---:|
| Principal Balance | 219,601.16 |
| Accrued interest to 10/05/06 | 57,798.14 |
| Pre-Accelerated Late Charges | 139.06 |
| Property Mortgage Insurance | 682.02 |
| Escrow Advance | 28,290.02 |
| Foreclosure fees and costs | 18,563.31 |
| **TOTAL DEBT** | **325,073.71** |


**B. Total Arrearage As Of October 5, 2006**

| | |
|---|---:|
| 4 Monthly Payments (12/1/01   3/1/02) @ 1,733.79 | 6,935.16 |
| 6 Monthly Payments (4/1/02 – 9/1/02) @ 1,593.82 | 9,562.92 |
| 6 Monthly Payments (10/1/02 – 3/1/03) @ 1,478.31 | 8,869.86 |
| 6 Monthly Payments (4/1/03 – 9/1/03) @ 1,415.59 | 8,493.54 |
| 6 Monthly Payments (10/1/03 – 3/1/04) @ 1,385.33 | 8,311.98 |
| 6 Monthly Payments (4/1/04 - 9/1/04) @ 1,400.19 | 8,401.14 |
| 6 Monthly Payments (10/1/04   3/1/05) @ 1,490.30 | 8,941.80 |
| 6 Monthly Payments (4/1/05 – 9/1/05) @ 1,614.44 | 9,686.64 |
| 6 Monthly Payments (10/1/05 – 3/1/06) @ 1,726.52 | 10,359.12 |
| 6 Monthly Payments (4/1/06   9/1/06) @ 1,841.34 | 11,048.25 |
| 1 Monthly Payment (10/1/06) @ 1,941.61 | 1,941.61 |
| Pre-Accelerated Late Charges | 139.06 |
| Property Mortgage Insurance | 682.02 |
| Escrow Shortage | 10,871.34 |
| Foreclosure fees and costs | 18,563.31 |
| **TOTAL ARREARAGE** | **122,807.75** |


**C. Post-petition attorney fees**                        300.00


**TOTAL ARREARAGE TO BE PAID THROUGH PLAN     123,107.75**

# EXHIBIT

# "E"

UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT
New Haven Division

| | |
|---|---|
| IN RE: | |
| JAN HERMAN VAN ECK | : CHAPTER 13 |
| DEBTOR | : CASE NO. 06-31703 ASD |
| | |
| WELLS FARGO BANK, N.A. | |
| MOVANT | : DOC. I.D. NO. |
| VS | |
| JAN HERMAN VAN ECK | |
| DEBTOR | |
| MOLLY T. WHITON, TRUSTEE | : JANUARY 4, 2007 |
| RESPONDENTS | |

MOTION FOR RELIEF FROM STAY

The undersigned Movant, WELLS FARGO BANK, N.A., a secured creditor of the above-named

Debtor ("Debtor"), by and through its undersigned attorneys, pursuant to 11 U.S.C. Section 362 (d) and

Bankruptcy Rule 4001, moves this Court for an Order affording relief from the automatic stay imposed

by 11 U.S.C., Section 362(a) ("Stay") and as grounds therefore respectfully represents the following to

the Court:

1.  Movant seeks relief for the purpose of foreclosing its mortgage against the Debtor's interest

in real property known as **24 Ebony Lane, Ivoryton a/k/a Essex, Connecticut.** The Movant further

seeks relief in order to contact the Debtor by telephone or written correspondence and, at its option,

offer, provide and enter into any potential forbearance agreement, loan modification, refinance

agreement or other loan workout/loss mitigation agreement. Any such agreement shall be non-recourse

unless included in a reaffirmation agreement.

2.  The Movant is the owner and holder of a Note secured by a Mortgage on property owned by

the Debtor known as **24 Ebony Lane, Ivoryton a/k/a Essex, Connecticut**, by virtue of an Assignment

of Mortgage dated March 14, 2003, to be recorded on the Ivoryton Land Records.

3. The fair market value of the property is $359,000.00. The amount of the Movant's debt is approximately $325,073.71. The Debtor has listed a $75,000.00 exemption on the property.

4. There is no equity for the unsecured Creditors of the Estate of the aforesaid property.

5. Upon information and belief no interest or principal payments are being made to Movant by the Debtor. The Debtor has defaulted in payments and/or failed to pay any post-petition payments due required by the mortgage note. The Debtor is post-petition due for three monthly payments (November 1, 2006 – January 1, 2007) at $1,941.61 each month, plus two monthly late charges at $79.92 each month, which totals $5,984.67.

6. The Debtor has not provided adequate protection of Movant's interest in their property on the above obligation and cause exists pursuant to 11 U.S.C. Section 362 (d)(1).

7. There is no equity for the unsecured creditors of the Estate and pursuant to 11 U.S.C. Section 362 (d)(2)(A) a Stay of proceedings against Movant should be modified to permit Movant to foreclose its interest in the Debtor's real property known as **24 Ebony Lane, Ivoryton a/k/a Essex, Connecticut.**

WHEREFORE, Movant requests relief from the Stay by allowing Movant to foreclose its interests in the Debtor's real property known as **24 Ebony Lane, Ivoryton a/k/a Essex, Connecticut.** Movant further requests relief from stay by allowing Movant to contact the Debtor by telephone or written correspondence and, at its option, offer, provide and enter into any potential forbearance agreement, loan modification, refinance agreement or other loan workout/loss mitigation agreement with any such agreement being non-recourse unless included in a reaffirmation agreement.

Movant finally requests that Rule 4001(a)(3) be declared inapplicable and that the Movant may immediately enforce the order.  Dated at Hartford, Connecticut this 4th day of January, 2007.

THE MOVANT

By: _____
    Linda J. St. Pierre, Esq.
    Hunt Leibert Jacobson, P.C.
    50 Weston St., Hartford, CT  06120
    Telephone No. (860) 808-0606
    Federal Bar No. 22287

DAI.

UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT
New Haven Division

IN RE:
JAN HERMAN VAN ECK                          :  CHAPTER 13
    DEBTOR                                  :  CASE NO. 06-31703 ASD

WELLS FARGO BANK, N.A.
    MOVANT                                  :  DOC. I.D. NO.
VS
JAN HERMAN VAN ECK
    DEBTOR
MOLLY T. WHITON, TRUSTEE                     :  JANUARY 4, 2007
    RESPONDENTS

## PROPOSED ORDER GRANTING WELLS FARGO BANK, N.A. RELIEF FROM STAY

The Motion for Relief from Automatic Stay (Doc. I.D. No. ___) in the above-entitled matter

having been properly noticed and heard, it is hereby

1.          **ORDERED** that the Automatic Stay in the above-captioned estate is modified to permit

WELLS FARGO BANK, N.A. and/or its successors and assigns to commence and/or continue and

prosecute to judgment a foreclosure action affecting the Debtor's interest in real property known as

**24 Ebony Lane, Ivoryton a/k/a Essex, Connecticut** in accordance with state law and/or permit

WELLS FARGO BANK, N.A. and/or its successors and assigns to contact the Debtor by telephone or

written correspondence and, at its option, offer, provide and enter into a potential forbearance

agreement, loan modification, refinance agreement or other loan workout/loss mitigation agreement.

Any such agreement shall be non-recourse unless included in a reaffirmation agreement. No foreclosure

deficiency judgment shall be enforced without further order of this Court, and

2.  **IT IS FURTHER ORDERED** that Fed.R.Bankr.P. 4001(a)(3) is not applicable so that WELLS FARGO BANK, N.A. may immediately enforce and implement this order granting relief from automatic stay.

# EXHIBIT

# "F"











# EXHIBIT

# "G"

This envelope is for use with the following services:

**UPS Next Day Air®**
**UPS Worldwide Express®**
**UPS 2nd Day Air®**

t **ups.com®** or call **1-800-PICK-UPS®** (1-800-742-5877)
chedule a pickup or find a drop off loca~~tion~~

**~~D~~estic Shipments**

qualify for the Letter rate, U~~PS~~
~~cor~~respondence, urgent docum~~ents~~
~~we~~igh 8 oz. or less. UPS Expres~~s~~
~~u~~se listed or weighing more th~~an~~

**~~Inter~~national Shipments**

~~th~~e UPS Express Envelope may b~~e~~
~~val~~ue. Certain countries consider~~~~
~~.up~~s.com/importexport to verify ~~~~

qualify for the Letter rate, the L~~~~
~~UP~~S Express Envelopes weighing ~~~~

~~UP~~S Express Envelopes are not rec~~~~
~~contai~~ning sensitive personal inform~~~~
~~ca~~sh equivalent.



FOLD HERE

TAMMY SIROIS
160241 2862 2862
HURT LIBBET AND JACOBSON PC
50 WESTON STREET
HARTFORD CT 06120

**SHIP TO:**
HERMANN JAN VANECK
24 EBONY LANE
IVORYTON CT 06442-1159

1.0 LBS    LTR        1 OF 1

CT 063 5-02

**UPS NEXT DAY AIR**

TRACKING #: 1Z 47E 5E3 01 9597 1241

BILLING: P/P

Reference#1: 90664-00002

HERMANN JAN VANECK
24 EBONY LN
IVORYTON CT 06442-1159

**P: RIGHT    S:**

**18 - 1255**
1247E5E3019597           1241
RSI#8YHQ        CTM:0101    JAN 20  07:35:55  2015
UR  8455        M/S  14.3.1   ZE3BA2H6488

t: 02D        A
1200

# Window Enve~~lope~~

Use this envelope with shipp~~ing labels printed on your laser~~
or inkjet printer on plain pap~~er.~~

https://www.ups.com/uis/create?ActionOriginPair=default___PrintWindowPage&key=lab...   1/26/2015

~~Inte~~rnational Shipping Notice — Carriage hereunder may be subject to the rules relating to liability and other terms and/or conditions established by the Convention for the Unification of Certain Rules Relating to International Carriage by Air (the "Warsaw C~~~~

2/3/15                                                    UPS: Tracking Information



United States                          New User ; Log-In   Contact UPS   The UPS Store   Search

My UPS    Shipping    **Tracking**    Freight    Locations    Support    UPS Solutions

**Save up to 18% on UPS shipping for your business.**
Sign up and start saving in **your** first week of shipping.                    Sign Up Now

| Tracking Number | Track | Log-In for additional tracking details. | Other Tracking Options ▾ |

Tracking Detail                                       Like  1.4m   Share   Print   Help   A A A

**1Z47E5E30195971241**                        Updated: 02/03/2015 11:12 P.M. Eastern Time

Delivered

**Shipping Information**

**To:**
IVORYTON, CT, US

**Scheduled Delivery:**
Scheduled delivery information is not available at this time. Please check back later.

Request Status Updates »

**Shipped By**

**UPS Next Day Air®**

**Last Location:**
Waterford, CT, United States, Wednesday, 01/28/2015

What time will your package be delivered to your home? Get FREE approximate Delivery Windows on most UPS packages.

**Continue**

I am already a UPS My Choice® Member

Shipment Progress                                                What's This?

| Location | Date | Local Time | Activity |
|---|---|---|---|
| Waterford, CT, United States | 01/28/2015 | 1:06 P.M. | Severe weather conditions have delayed delivery. |
| | 01/28/2015 | 1:06 P.M. | Delivered |
| | 01/28/2015 | 7:35 A.M. | Out For Delivery |
| | 01/28/2015 | 6:30 A.M. | Arrival Scan |
| Hartford, CT, United States | 01/28/2015 | 5:08 A.M. | Departure Scan |
| Hartford, CT, United States | 01/26/2015 | 7:48 P.M. | Origin Scan |
| | 01/26/2015 | 5:37 P.M. | Pickup Scan |
| United States | 01/26/2015 | 3:42 P.M. | Order Processed: Ready for UPS |

Additional Information

| | |
|---|---|
| **Shipped/Billed On:** | 01/26/2015 |
| **Type:** | Package |
| **Weight:** | 1.00 lb |

Subscribe to UPS E-mail:  Enter e-mail address       Sign Up »   View Examples

**Contact UPS**
Browse Online Support
E-mail UPS
Live Chat
Call Customer Service

**Support**
Get Started
Register
Open a Shipping Account
Change Your Delivery

**Solutions for:**
Healthcare
Small Business
High Tech
More...

**Other UPS Sites:**
Select a website  ▾

**Follow us:**